Good morning ladies and gentlemen. Our first case for this morning is Advanced Cable Company v. Cincinnati Insurance Company. And so we are ready for you Mr. Bretan if you are ready for us. May it please the court and counsel. My name is Mark Bretan. I represent the appellant Cincinnati Insurance Company. In our briefing I noticed in preparing yesterday we opened fire on each other in terms of what standard does the court apply in construing insurance policy language such as some of the language here, the direct physical loss language and what not. The appellees seem to like dictionary definitions. We focused more on case law. But what I thought I would do to start out is even accepting that we should look at and dictionary definitions. I think that the dictionary definitions that Advanced Cable cites actually support our position. If you look on page three of their final reply brief they use a dictionary definition defining loss as loss or harm resulting from injury to property. And so the question I have what harm has the appellees suffered in this case under that dictionary definition? So let me turn it around though and ask you where in our starting point of course under Wisconsin law as well as every other law I know is the says cosmetic damage or damage that can't be seen without climbing up a ladder or something like that from the street is excluded. It simply says we will pay for direct physical loss and loss as the district court pointed out is a different word from damage. There's the word or that separates them. So I'm having trouble seeing where grounded in the policy language you can even get to first base. You get to first base on the basis that an insurance policy cannot anticipate every event or contingency that may happen. Well but an insurance policy certainly can say we're going to pay for all direct physical losses or damage loss or damage and this roof was certainly damaged by the hail. There are pings all over it, some of them tiny, some of them maybe as big as an inch and that's damage. I would disagree with that. Really? Yes because if the insured has not suffered any harm from the dents then there's been no damage. But why does harm exclude even aesthetic harm? So the amici give you the example of graffiti for example. So if somebody went up to the roof and sprayed obnoxious graffiti all over the roof would you say the roof has not been damaged? If obnoxious graffiti meaning profanity possibly if it's just ordinary graffiti I would say probably not. Well ordinary graffiti could even be gang graffiti but if you're willing to say that profanity damages the roof I don't see why spray painted profanity changes the useful life of the roof. It's going to serve as a roof just as long as it did without the profanity on it. Well in that sense it may not be damaged, it may not be lost. But people regularly spend significant amounts of money sandblasting or repainting or in some other way removing graffiti. I doubt they do it very often for roofs. If it's graffiti that can be seen on the side of a building, absolutely. And I suspect, I don't make claims decisions for Cincinnati or for any other insurer, but I suspect that is direct physical loss. Even though it fails the test, even on the side of the building it fails the test that you're proposing because graffiti spray painted on the side of a building doesn't again change the building's ability to keep water out or keep people warm or the useful life of the building. It just makes it ugly. It would however be harm. If people can see it, it would be harm. Well see, there I think you're in dangerous territory because I come back to the policy. The policy says we will pay for direct physical loss at the premises. This is certainly direct. There's been damage to the building. The policy defines loss as accidental loss or damage. And so even if the damage doesn't entail a loss, the damage is a separate word. You think that the policy just stops with the word loss means accidental loss, period. No, I would say the roof has not been, there's been no loss or damage, but it has been damaged. It's been dented. It's not the same roof it was before the hail storm. But that doesn't make it damage when you consider what the purpose of insurance is. But why do we get into the purpose of insurance if the roof is damaged? The roof is impaired. There's little dings all over it. Well except the roof is not impaired. That's the whole point. It's got little dings all over it. I don't want to bandy words with you here, but it does have, it's different from what it was before the hail storm. Except with respect, we are bandying words. And that's what this comes down to. No, I think that with respect, your insurance policy, until you submitted the proposal to change the scope of coverage, didn't distinguish along the lines that you are now arguing for. Well again, I believe it did in the sense that it required, whether you look at the term loss or damage, the insured has to have lost something before they get insurance. And every case that's considered. You're reading damage out of the policy again. No, I'm not. How have they been damaged by something that doesn't harm their roof? The reason, I think the reason is that these assessments, I mean if you want me to speculate on a possible reason, are less than scientifically 100% accurate. One expert here thinks that these dings didn't harm the galvanized surface of the roof. Another person thinks maybe it did. People try to be careful about these things. But anyway, Judge Fulham had a question. Yeah, what about diminution of the value of the building for resale? I mean on day one before hail, the building is estimated to be worth X. Is there an X minus after the hail damage? Or the hail, I know you call it damage. Well, two things. Number one, I'm not sure that's before us because the district court suggested it might be and then at the very end said no. But it is before us since it's a way of understanding what the consequence, shall we say, to the insured party is. So I don't think you can elide it that easily. Well except we didn't develop the proof or because the district court sort of suggested maybe that's the standard and then took it off the table. We never really developed that. But I can say based on the report, Larson, the owner of the building, had his price at 1.8 some odd million. Before the hail storm, the Welton Limited Family Partnership offered him about 1.7. They then learned of what they consider to be the hail damage, I'll call it denting, and nevertheless came back knowing full well having had the roof inspected and gave him his 1.845 or whatever it was. But they knew this claim was pending too. Correct. So that the point being that if the claim compensates for the consequences, the damage to the roof from the hail storm, you would pay the same amount of money because the claim would bring it back up to the level where it was before. Or they might lose the claim. You would, sort of two part thing, the... What you're saying basically is the roof still works just as it did before, nobody can see it, so what's the big deal? What I want to know is where did the $175,000 come from? That was, I guess, a replacement value, wasn't it? It was a compromise settlement for replacement value. Well, somehow or other, you end up owing that. Yeah, there's a judgment against us, right. Yeah, but that's for $175,000. Right. And that was, I thought, a replacement value. Maybe not, I don't know what it was. Tell me, where'd that come from? The settlement was based on replacement value. So that's... It was a compromise, they wanted much more, we wanted to pay less, but that was a compromise settlement. Okay, so what's your... You object to that, because that somehow or other is attributed to the loss? I guess I'm not understanding... No, I don't understand where it came from, because... I... I'm sorry. No, I was just going to say, if I understood correctly, maybe this will help you answer Judge Mannion's question. You, right now, are contesting coverage, but then after you lost on the coverage point in the district court, you were willing to come to a settlement on the amount of loss, obviously contingent on the coverage decision being upheld, but if the coverage decision is reversed, then of course you won't have to pay anything. Is that where we are at this point? Yes, and that's pretty common for somebody to stipulate to, okay, what's the amount that's there now? So it comes back then to the fact that your position is that the rain or whatever still runs off the roof, that nobody can see it anyway, so there's no damage. Right. Yeah, okay, well that's... That's... I just want to make clear that that's... That issue is... Would make a difference, but I... And now she helped me understand exactly where the $175,000 came from, so you're stuck with that if you don't get a reversal on the damage issue. Right, it was a compromise settlement of what the replacement cost would be. Again, wasn't nearly what they wanted. It was more than we wanted. It was a classic compromise, but in terms of... I'd kind of like to get back to something you raised a few minutes ago, Justice Wood, which is when you said, well... Judge. Okay, Judge. You said something about, well, their experts say the roof was damaged, physically injured, what we're calling structural injury in our briefs. But we're really not considering that, because they premised their summary judgment motion, and the district court premised its opinion on the notion that there was no structural injury to the roof. No, I understand that, and actually I'm perfectly happy to approach the case that way, but we were speculating... I guess what I was making was a somewhat more subtle point that you can never be certain when events like this happen, whether damage that is invisible at moment one might be so tiny... It doesn't take much for water to get into something and cause rust. Maybe a year later, two years later you discover that what you thought was cosmetic only turns out to be worse than that. So we were just... I thought we were just speculating about why would somebody care about cosmetic damage, and I thought uncertainties were one of the answers. But you're right. I mean, the district judge said cosmetic, and I don't see why direct physical loss, in my graffiti example, that's why I was trying to use that, isn't a physical loss that's a cosmetic loss that's not a useful life kind of loss. Well, maybe I can illustrate it with a hypothetical. Let's say you have a commercial building with a roof as we have here that nobody can see, and let's say you have company automobiles in the parking lot uncovered, and you have a hailstorm, and you have the type of denting that we had here to the roof. You also have denting to the cars. Again, I don't make claims decisions for Cincinnati or any other insurers, but based on the nature of my practice and my dealing with things, most insurers are going to cover the denting to the cars, even though the car still functions as a car, still drives as a car, it still is something that's in the absence of cosmetic damages exclusion, it's something that is unsightly, and the insured has lost something. Because they've lost the nice appearance of their car. They've also lost the value. Because a car cannot be sold for the same price, a dented car cannot, reasonable people would have to agree to that Mr. Patan. A dented car will not bring the price of a non-dented car. Well, and I am conceding, and I think most insurers would, that to the cars, that hailstorm would have caused direct physical loss. But to the roof, it did not, because they haven't lost anything. Well, I mean, you keep saying that, but I guess I see the sale as being one of the price plus the claim, whereas you see it as only the price. And, you know, when people sell major commercial buildings, it's typical that there will be an inspector that will come look at the building, they'll evaluate the condition of the roof, they'll evaluate the HVAC system, they'll evaluate whatever else they need to evaluate. So, I think that it's hard to avoid the point that Judge Flom is making. Could I ask you another question? What's the difference between direct and indirect physical loss? What does direct add? Does it help us in any way to answer this? I don't think so in this case. I think we're looking at the terms physical, and we're looking at the terms loss. So that's really, it's not only not helpful, but is it almost meaningless term? Well, I can see in some cases whether something's direct or not might be a big issue. So there's no intervening factor here. I mean, the hail pings on the roof and it harms the roof. There's nothing that happens between the hail and the roof damage. I agree with everything you said except the word harms. Okay. I know you don't agree with that. I know you don't agree with that. And I'm going to tell you, if you'd like to save a minute or two for rebuttal, maybe you want to consider that now. I will do that now. Thank you. Sure. Mr. Schmidt. May it please the Court, Counsel? My name is Charles Schmidt. I represent the Appalese Cross Appellants. I'd like to start out with the question that you led off with. What harm have the Appalese suffered? I think that's very simple. We had an undented roof to begin with. We have a dented roof now. That's the damage. What is the value of that damage? $175,000. Well, I mean, we don't want to confuse coverage and damages. I think you in particular don't want to confuse coverage and damages. So coverage depends on whether there is direct physical loss to the premises, and nobody's arguing about that. We know that 2113 Eagle Drive is one of the premises covered. And so we have to understand what is a loss, what's an accidental loss or damage. I would absolutely agree with you. I don't think we can conflate the two concepts. I think Cincinnati has done that. So as I understood the district court's opinion before the stipulation was or before the agreed amount of the judgment was reached, is that the judge thought that although there was coverage under his reading of the policy, it sounded to me as though he thought it was quite possible that the amount of damages was or that the value of this was very low, that maybe there wasn't much of a difference between the building before and building after, or maybe there wasn't very much that actually needed to be done to bring the roof back up to an appropriate condition.  Is that your understanding? I submit that that's where the court went wrong. That was in part of his bad faith analysis, and the difficulty that we had was that he does say what I'm saying. He absolutely does. I agree with you. The problem is that he seemed to have taken up this damage issue that neither side was disputing. Cincinnati made a stand on the notion that there was no coverage. Nobody ever disputed that if there is coverage, there is going to be some physical cost to repair that. Right, and the only reason I'm raising this is because your opponent is arguing quite animatedly that although this hailstorm may have left you with an ugly roof, it really wasn't from an economic point of view much of a loss at all. And so why should the insurance company have to buy you a new roof for something that was really no problem?  Under the language of this policy, there is coverage, but the amount of money that's going to exchange hands might be rather low because of the nature of the damage. That could have been the case at that point, but nobody disputed that some amount of money would have to change hands. Right, some amount of money, whether it was $10,000, whether it was $175,000, whether it was half a million, whatever it was, some amount of money was going to change hands. So really that's an issue of damages that doesn't go to coverage because the policy doesn't define damage in terms of economic loss. It defines damage in terms of direct physical loss. We never claimed diminution of value. Cincinnati agreed this case is not about diminution of value. So I think it's disingenuous for Cincinnati to suggest somehow that maybe our claim should be valued in diminution of value. We paid a premium for replacement cost coverage. Regardless of diminution, we get back what we had before. In fact, you could hypothetically come up with a circumstance where somebody, say a movie producer, would want to pay more for a house that has a hail-damaged roof because then they don't have to build the set. We don't look at market value. That has no bearing whatsoever on the policy. I would, however, like to just quickly address the bad faith element since you sort of segued into that a bit with the course reasoning on the damages issue. As we have argued and as the district court agreed, the plain and ordinary meaning of this policy says that we have coverage. But, you know, people argue about plain meaning all the time. The district court, who ruled for you on the main event, didn't find Cincinnati's arguments to be so far out of the ballpark as to amount to bad faith. Cincinnati works with you. They send inspectors. They offer the settlement on the other property that we're not talking about. I don't, I mean, you know, these are, under Wisconsin law, it seems that the threshold for a bad faith case against an insurer is relatively high. The district court didn't think that was reached. Well, you have to remember under the Anderson Standard, which has been Wisconsin law for over 35 years, there are two ways to commit bad faith. You can either fail to investigate the facts properly or you can fail to apply the policy to those facts properly, the analysis element. So you agree it's not the first? I agree. We disagree with their investigation, but I don't think it was bad faith. No. It's the second element, the fact that the policy, as the court agreed and assuming this court agrees, unambiguously says that there's coverage. That is an objective standard based on the plain language of the policy. How can a policy un- So are you arguing that Wisconsin would find bad faith every time a court says the plain, quote-unquote, plain language of the policy favors the insured? Not necessarily. So where's the line? If it is unambiguous, like you've got here, I think an insurance company then has to show its work. How on earth could it conclude that an unambiguous objective policy providing coverage somehow fairly debatably provides coverage? Well, they have done that in the sense of explaining to us which words they understand in a different way. Now, whether they're right or not is obviously a different issue. That's a coverage issue. That's part one of your case. But they've explained that they think that damage doesn't include cosmetic damage, that there's no loss if there's nothing visible and there's no effect on useful life. They've cited cases. So why is all of that not enough? If the policy unambiguously says otherwise, how can that be reasonable? How can an unambiguous policy be fairly debatable in its text? Do you have any idea, Mr. Schmidt, how often this court hears cases from Party A saying it unambiguously means black and Party B who says it unambiguously means white? I certainly understand. But I think the proof is in the recent Coppins case that came out of the Wisconsin Court of Appeals. Very similar situation where the Court of Appeals said policy unambiguously, by dictionary definition, provides coverage. In fact, in that case it was a damage issue. And then the court said, to back that up, let's look at what the insurance company's own website says. That also gives a reasonable inference. And let's look at what the insurance commissioner's website says. That also gives a reasonable inference. Remember, I'm not asking for a ruling as a matter of law. I'm simply asking the court to reverse a summary judgment to allow me to present my case to a jury. And here we've got an unambiguous policy coupled with the fact that there is no evidence whatsoever in the record that Cincinnati ever looked at the policy itself before it denied coverage. How can you say that when they're working with you under the policy? It's not like they just disappeared from the surface of the earth. I agree. They sent Mr. Phillips out, but Mr. Phillips testified he's never seen the policy. He has no idea what it says. But that's not his job. I mean, look. I agree. I mean, lawyers read policies, right? Not people who crawl around on roofs and assess whether the galvanized steel has gotten ruptured or not. I'd like to point the court's attention to the affidavit that Cincinnati cited for purposes of showing that it actually analyzed coverage. They contend that they outsourced their obligation to Mr. Rattan, but in that same affidavit, two paragraphs later, they say Cincinnati did not retain Attorney Mark Rattan or any other attorney to adjust the claim at issue in this case or to make coverage determinations. The paragraph that they actually cite, two paragraphs earlier, say that they sort of conflictingly says that they retained him on January 25th, and mind you, that's three months before they denied coverage, to represent Cincinnati in the anticipated lawsuits and evaluate coverage issues, which they seem to deny two paragraphs later, and formulate litigation strategy. That in itself suggests that before they ever looked at coverage, they were anticipating litigation. How could they have reasonably done that if they weren't planning on denying coverage to begin with? Well, that seems like a very strange position to take, that insurance companies shouldn't assess their legal position and decide in the light of what advice they receive. They certainly should, but they shouldn't be anticipating litigation until they decide and deny. I don't know. I think that suggests a sharper line of demarcation between the period when you're assessing what does the policy require, what have we promised to do for this coverage,  and then the moment where you think, okay, we really can feel this adversary relationship coming on, so now we're in a litigation posture where product applies, whatever. Well, again, before they analyze coverage and deny coverage, I think that the attorney-client cases that have come out of Wisconsin pretty clearly say that you can't reasonably anticipate litigation until you deny coverage. So here they're anticipating litigation before they look at coverage. Again, I think that is a fact that when construed in our favor, and inference when construed in our favor, suggests that there may have been some sort of make up your mind first and then try to justify it later. It seems pretty speculative. What if discovery in a particular insurance case evidenced that it's routine practice for in-house counsel to look at a claim from day one, the day it's submitted, as well as a decision the next day to send the inspector out? Would you say that practice of having a counsel look at it simultaneously at in-house counsel, for example? No, I would submit that that's a good practice. No, absolutely not. But I think that an insurance company that does that should show its work. How, if the policy says otherwise, did they get to the conclusion that there's either fairly debatable coverage or that there's no coverage whatsoever? If they had simply put their analysis into the record, we may not be standing here. Why do we care about how they got there? I mean, they've given us the bottom line. They've told us what their conclusion was. Why do all the memos leading up to that matter? The bottom line is just flat-out wrong, and it doesn't apply to Wisconsin law. They've applied four cases, two of which are immaterial, two of which actually support us. So how did they skip the dictionary definitions, which is Wisconsin law, go to non-Wisconsin cases looking at non-Wisconsin law, two cases don't apply, two cases support us, and then conclude that they should still deny coverage? But your position is a little bit inconsistent here because you also seem to be arguing that these insurance policies are not negotiated on a one-by-one basis. They tend to use language that's used all over the country. I mean, there are these kind of off-the-shelf policies that organizations come up with. And you seem to be saying that Cincinnati was aware of this magazine article that you pointed to, and it wasn't talking about Wisconsin in particular. It was just talking about this generic language. So if it really is generic around the country, why not look at cases from other jurisdictions? Simply non-Wisconsin law. This court just held weeks ago in the Straus case, citing the Johnson Controls decision from Wisconsin Supreme Court that you look first to the dictionary definition if the words aren't defined in the policy, unless the dictionary definition is ambiguous. And many other states have the identical rule. I mean, I would want to at least know that there was some difference between Wisconsin law and the law of Massachusetts or whatever other law we're talking about. Sometimes there's a difference. That's interesting and important to know. And oftentimes there's not. I submit that under the Wisconsin Supreme Court precedent, the analysis should start and end with the dictionary definitions. And Cincinnati hasn't disputed our definition until just this morning, and they haven't come up with their own definition at all. So which dictionary definition are you focusing on, physical or laws or material or? All three, the ones that were cited in both sets of briefs. If you have a question about any particular one, but they are quoted in both sets of briefs. I would point out, by the way, that the dictionary definition of structural also would support our conclusion. If you want to take a look at that, structural simply means of or pertaining to a structure. And if you look at the definition of structure, it basically says a building. So even under their definition of structural, we'd still have coverage. They seem to be arguing that this court should adopt their definition of structural out of the endorsement that they submitted two years later for approval. So material, though, certainly means two different things. Material could mean it really matters. That's often what it means, like material misrepresentations in the law. Or material could mean having to do with matter, and thus roughly a synonym for physical substances. It's material, not insubstantial. It's material, not, you know, ethereal. So if they think material means important, that takes you actually pretty quickly to their position. I don't know how they could think that, though. The case they cited for that proposition is Crestview. And if you look at the definition Crestview cited, the definition that they used was the same definition that we used. This is our poltergeist tree, right? Correct. Yes. The poltergeist tree case. If only one of the definitions makes sense in the context, then that's the only one they can look at. We've gone away a little bit from this being so obvious. And, you know, I guess, do you have any idea how often in Wisconsin people prevail on bad faith denial claims? I couldn't possibly guess, but I'd submit that if it's not bad faith in this case, I just can't imagine what is. If an insurance company has unambiguous, objective policy language that goes against them and they haven't shown their work to how they could have concluded otherwise, how can they argue that they did a reasonable investigation? I mean, isn't that bad faith in itself? If it's not, then the second prong of Anderson is effectively written out of Wisconsin law. They can come up with any interpretation of a policy, no matter how absurd, and say, well, we investigated the case and that's good enough. Well, I think where I would perhaps underline what you just said is no matter how absurd, I can certainly think of positions that would be untethered to any language in the policy and you wouldn't accept them, but they have found a hook or two here. Well, certainly. I mean, we wouldn't be here if they hadn't found a hook or two, but it doesn't mean the hook is reasonable. Let me ask you the same question I asked Mr. Ratan. What does the word direct add or not to this definition? I think it's non-incidental. Is it the equivalent of an insurance policy that says any direct versus just direct? Suppose we had a policy that says any direct physical loss rather than direct physical loss. Would that modify, would that speak to a bad faith interpretation? I'm not saying that he searched and found such a policy, but what if we had a policy that said any direct? Would that change the interpretation of direct physical? The word any would have to mean something, I suspect. That's what I meant. So your interpretation is that we should read any into this, right? No, my interpretation is that it says direct physical loss. No, no, I thought you just said to me any would make, any, I won't put words in your mouth. What if it said any direct physical loss? Would it make any change here? I thought you said it might. I don't know in this particular case. Any case. I'm just talking about abstractly the term any direct physical cost. I'm not advancing this, I'm just raising it as a hypothetical. Any direct physical loss versus a policy that just says direct physical loss. Would that change, would that be okay for an insurance company to say, well, without any, we're going to think there's some room here versus any which would preclude any room, so to speak. I don't know that it truly would give a lot of wiggle room simply because this is an all-risk policy. This particular policy has been interpreted across the country to cover any direct physical loss unless it's expressly excluded or limited, and this policy itself says we cover direct physical loss unless. That's what I'm saying. So we're reading any into this, right? I don't know that you necessarily are. Well, what would be a fair reading of our holding for your position? Wouldn't it be that we're reading any into it? I think the flip side to your suggestion is that the court should somehow modify direct physical loss without any words to suggest that maybe Mr. Rutan is right. We cover direct physical loss, but we're not going to tell you what direct physical loss we cover. We'll cover physical loss if it's cosmetic, but only if it's visible from ground level. So I thought your position was that in insurance law in general, there are coverage provisions, there are exceptions from coverage provisions, so you have to construe how far the coverage provision goes, and then you have to look and see if there's an exception, and that in the absence of an exception, it doesn't say we will pay for some direct physical loss without telling you which ones are not covered. That would have to be an exception clause. Yeah, that's exactly how this policy is written. It gives a broad grant of coverage that says direct physical loss, and then it goes down later and says essentially we cover all direct physical loss unless limited or excluded. There is no limit or exclusion, obviously. So the only argument that they've got is somehow this court should just read that And if the court does that, I don't see any way that a policyholder could ever possibly anticipate what's covered and what's not covered. I mean, for example, to go to your point with regard to the word material, if we're going to start quibbling over what's material and what's not material, here we've got $175,000 replacement cost. Is that material? Certainly to most people it would be, but let's say this is the Willis Tower we're talking about that might cost billions of dollars. In that case, maybe it's not material. I think the insurance company has weeded out non-material losses by simply having a deductible. So if this were a scratch on one of the panels where you could simply buff it out for $20, that wouldn't even meet the deductible. We're saved. The insurance company has a tough time here because they're trying to argue that this is not material, as in not a big deal, but at the same time they know that this is $175,000. And to go to Mr. Rutan's point that this is a compromise settlement, I would point out that this is one of the few cases where the sides really closely agreed. I see my light is on. Can I finish? You can finish your thought. Our expert came up with a $175,000 number. Their expert gave a range. Our number was almost smack dab in the middle of that range. So it's not like this is a compromise where nobody agreed and we met in the middle. We had already met in the middle. We simply agreed that we weren't going to fight over slightly more or less. Okay. Thank you. Thank you very much. Anything further, Mr. Rutan? Yes. I want to really quickly try to put the diminution of value issue to rest because you had asked about it and I didn't get a chance given the time limits to fully respond, and counsel brought it up. Diminution of value is not at issue here. The district court a couple times suggested it might be, and then on clarification took it off the table in his opinion, and then on June 27th in an oral hearing on the record. So when you were saying, Judge Flom, that while there's been a diminution of value if the roof is dented, even if it's not structural, not on the table here for part of today's. It's just not. We've constantly been accused of arguing that it's a diminution of value standard, and we didn't. We asked the district court to tell us if that's where he was going so we would know what case to try. So I'd like to put that to rest. Also something that was said on rebuttal is that some money would have to change hands under the case that the district court set up for trial. And I'm not sure that's true because if you read his opinion carefully, at one point he says, okay, it is direct physical loss. Then he says we're going to try the case and to determine how much, quote, damages the insured is entitled to. And then he says, if any. So it could have been zero. Now we opted to stipulate to what the replacement cost would be. So I just wanted to make that clear. In his final brief and on oral argument, counsel brought up the recently decided Coppins case in Wisconsin. Completely not on point. The Coppins case, the policy clearly said actual cash value is the measure of recovery. There was a definition of it in the policy. The insurance commissioner had issued an opinion or an advisory on it. And what the insurer did was try to use market value as the measure of loss. And that's a totally different case. What Cincinnati did here is interpret the term direct physical loss and what it means and how it applies here. And how could you say an insurer is in bad faith for concluding that in this case, this is not direct physical loss when there's not a lot of case law out there but every case that is out there says cosmetic damage is not covered. How could the insurer's interpretation be unreasonable? I think that's an overstatement of what the cases out there say. But I'll accept that if you had some cases that somehow or another excluded cosmetic. Well, and we do. And then the Ports of Indiana case, the court's exact quote was, for there to be a loss there must be a quantifiable loss in the property's usefulness or in its function for normal purposes. Right, but that case, as I recall, didn't ever decide whether the damage that the plaintiff claimed qualified for coverage. And there were exceptions in that policy for gradual deterioration, for wear and tear, for other sorts of things. So, I mean, you can play around with whether it's distinguishable. I think it may be. But that makes it debatable. Well, but the court says the cosmetics and aesthetics of the property were not at issue because the plaintiff hadn't made a claim for it. So if the court hasn't been asked to decide an issue, it's pretty hard to say that it did decide it. I think you're mixing and matching the Ports of Indiana case with the Demers case. No, I don't think so, actually. The Ports of Indiana case set a standard for direct physical loss, saying there must be a loss in the usefulness or function for normal purposes. The Demers case, cosmetic injury was not directly an issue, but the court said, oh, by the way, it's not covered. Well, I mean, I don't think so. In any event, just two things. Given the case law that's out there and given the dictionary definitions, I don't see how a court could say it's unreasonable that we made an interpretation that's objectively or subjectively unreasonable. And a jury can't determine that, by the way. Mr. Schmidt says he wants a jury trial. This case is about whether Cincinnati's interpretation of the direct physical loss language was unreasonable. Courts have to do that. Juries don't do that. So I would leave the court with that question, which is, was the interpretation unreasonable? And I think even if you disagree with it, it was still a reasonable interpretation. On the coverage issue, ask yourselves, what did the insured lose here? They didn't lose anything. And that's our position. And insurance is not to make a profit. Insurance is when you've actually lost something. And a tented roof that still functions is not a loss to anybody. And I see my liaison. Thank you. All right, thank you very much. Thanks to both counsel. We'll take the case under advisement.